IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NANCY C. ROBERTS, | : | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | : | CIVIL NO. 09-2211 (JBS) |
| v. | : | |
| | : | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

APPEARANCES:

Philip Wolf, Esq.
WOLF & BROWN, LLC
228 Kings Highway East
Haddonfield, NJ 08033
    Attorney for Plaintiff

Sandra M. Grossfeld, Special Assistant United States Attorney
SOCIAL SECURITY ADMINISTRATION
26 Federal Plaza
Room 3904
New York, NY 10278
    Attorney for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of the Social Security Administration denying the application of Plaintiff, Nancy C. Roberts ("Plaintiff"), for disability insurance benefits ("DIB") under Sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and for supplemental security income benefits ("SSI") under Section 1614(a)(3)(A) of the Act, 42 U.S.C. § 1382c(a)(3)(A). For the

reasons set forth below, the Court will remand this action to the Administrative Law Judge ("ALJ") for proper consideration of Plaintiff's feet deformity and her inability to afford a corrective hearing aid.

I.   **BACKGROUND**

    **A.   Procedural History**

Plaintiff submitted her application for SSI and DIB on March 14, 2004, alleging that arthritis prevented her from working. That application was denied both on initial review and on reconsideration.  Plaintiff sought an administrative hearing, which was held on May 8, 2006 before the ALJ.  On July 26, 2006, the ALJ issued his opinion denying Plaintiff entitlement to DIB and SSI.  Plaintiff sought review of that decision, and the Appeals Council issued an order remanding the case for the ALJ to give consideration to the opinion of Plaintiff's treating physician.  Following a supplemental hearing on June 18, 2007, on August 9, 2007, the ALJ issued a second opinion denying Plaintiff's claims for benefits.  The Appeals Council denied Plaintiff's request for review and the decision of the ALJ became the final decision of the Commissioner.  Plaintiff timely filed this action.

    **B.   The ALJ Opinion**

After reviewing the applicable law, the ALJ began his opinion by determining that Plaintiff has not engaged in

substantial gainful activity since June 24, 2003.  (R. at 48.)
The ALJ concluded that Plaintiff suffers from mild to moderate
osteoarthritis of the left knee and degenerative disc disease,
which combined had the effect of limiting Plaintiff's ability "to
lift and/or carry and her ability to engage in certain postural
activities."  (R. at 49.)  Consequently, the ALJ found these two
conditions to be "severe" for the purposes of his disability
determination.  (Id.)  Plaintiff's alleged depression and hearing
loss, however, caused no work-related functional limitations and
were therefore not "severe" according to the ALJ.  (Id.)  With
regards to Plaintiff's hearing loss, the ALJ supported his
determination by noting that Dr. Christine Cicco, an ear, nose,
and throat specialist, found that Plaintiff would be able to work
without restriction with the help of hearing aids.  (Id.)  Though
the ALJ found that Plaintiff did have impairments, he concluded
that none of the impairments were among those listed in 20 C.F.R.
Part 404, Subpart P, Appendix 1.  (R. at 49-50.)

    The ALJ found Plaintiff to have a residual functional
capacity as follows: "[T]he claimant can lift and/or carry 20
pounds frequently; can stand and/or walk for 6 hours and sit for
6 hours in an 8-hour workday; and can frequently climb ramps and
stairs, balance, stoop, kneel and crouch.  She is precluded from
crawling and from climbing ladders, ropes and scaffolds and
should otherwise avoid exposure to unrestricted heights."  (R. at

50, 54.)  In support of this determination the ALJ summarized Plaintiff's testimony at both evidentiary hearings and observed that the medical evidence showed that Plaintiff has degenerative joint disease of the lumbosacral spine (citing R. at 273), degenerative disc disease of the cervical spine (citing R. at 270), and osteoarthritis of both knees (citing R. at 269).  (R. at 50.)  An electrodiagnostic consultation on December 2, 2004 found no acute radiculopathy (citing R. at 354).  (Id.)

The ALJ then summarized the findings of the various medical professionals to have treated Plaintiff.  The ALJ observed that Dr. Allen Auerbach, Plaintiff's primary care physician, noted on Marcy 18, 2004 that Plaintiff was unable to work (citing R. at 253).  (R. at 51.)  The ALJ reported that Dr. Jack DiMarco performed a consultative evaluation on September 21, 2004, in which he performed a physical examination and diagnosed probable degenerative arthritis, degenerative disc disease of the lumbar spine, and arthritis of the knees (citing R. at 274-77).  (Id.) The ALJ noted Dr. DiMarco's conclusion that Plaintiff would have difficulty lifting and carrying heavy objects, flexing or extending her lumbar spine, and climbing or balancing (citing R. at 276).  (Id.)  Dr. DiMarco, the ALJ observed, had no difficulty communicating with Plaintiff despite her difficulty hearing (citing R. at 275).  (Id.)

The ALJ summarized the November 1, 2004 findings of a state agency medical reviewer, where the reviewer found that Plaintiff could life and/or carry 20 pounds occasionally and 10 pounds frequently, can stand and/or walk for 6 hours and sit for 6 hours in an 8-hour work day, and can only occasionally climb, crouch and crawl (citing R. at 304-11).  (Id.)  On November 17, 2004, the ALJ observed, Dr. Marc Kahn performed an orthopedic evaluation of Plaintiff in which he found tenderness in her lumbar spine and knees, but no abnormalities in her motor, sensory and reflex exams except for weak bilateral Achilles reflexes (citing R. at 373, 350).  (Id.)  The ALJ recognized that Dr. Kahn diagnosed Plaintiff with multilevel degenerative disc disease with radiculopathy and internal derangement of both knees (citing R. at 350).  (Id.)  The ALJ further noted that Plaintiff subsequently received physical therapy (citing R. at 358-63, 425, 427), and by March 21, 2005 she reported to feel at least 80 percent better (citing R. at 425).  (R. at 51-52.)  The ALJ observed that Dr. Auerbach's treatment notes from July and August 2005 do not indicate complaints of back or extremity pain (citing R. at 321-24).  (R. at 52.)

The ALJ considered Plaintiff's arthroscopic surgery to her left knee on February 28, 2006.  (Id.)  On January 11, 2006, the ALJ stated, Plaintiff reported to Dr. Kahn only occasional lower back and right knee pain, but her left knee was painful (citing

5

R. at 424).  (Id.)  After an MRI discovered a medial meniscal
tear in Plaintiff's left knee, Dr. Kahn performed surgery and by
May 3, 2006, after a period of physical therapy, Dr. Kahn found
that Plaintiff was doing "quite well" and would be discharged to
a home exercise program (citing R. at 398).  (Id.)

        The ALJ considered Dr. Auerbach's various letters to
Plaintiff's counsel, in which he indicates that Plaintiff is
unable to work and has been unable to work for three or four
years (citing R. at 449-50).  (Id.)  The ALJ noted that while Dr.
Auerbach's treatment records for March 27, 2007 indicate problems
with Plaintiff's legs and back, his April 11, 2007 and May 2007
records indicate there were no such problems (citing R. at 457-
61).  (Id.)

        Finally, the ALJ explained the weight he would give to the
evidence in the record.  He explained that he found Plaintiff's
testimony regarding her pain and physical limitations "not
entirely credible" because it was contradicted by evidence
showing that as of 2005 Plaintiff felt "at least 80%" better
following physical rehabilitation and Dr. Kahn's report that she
was doing well following arthroscopic surgery and physical
therapy.  (R. at 53.)  The ALJ doubted Plaintiff's testimony
regarding her upper extremities, because there was no evidence
that Plaintiff reported these complaints to her treating
physicians.  (Id.)  In addition, the ALJ questioned Plaintiff's

credibility because she told the unemployment office that she left her most recent employment because of a dispute with her manager (citing R. at 164), but she testified before the ALJ that she stopped working because of the pain.  (R. at 54.)  The ALJ doubted Plaintiff's complaints of pain because she was not taking any narcotic pain relievers and because she had indicated that her pain decreased with physical therapy.  (Id.)

The ALJ gave less weight to Dr. Auerbach's opinion, finding "Dr. Auerbach's opinion that the claimant has been continuously disabled for over four years is contradicted by his own treatment notes and the medical evidence as a whole."  (Id.)  Instead, the ALJ gave greater weight to Dr. DiMarco's opinion.  (Id.)

At the last stage of the analysis, the ALJ determined that Plaintiff had past relevant work as a cashier and that, in light of her residual functional capacity, she could perform this job as it is performed in the national economy based on the Dictionary of Occupational Titles ("DOT").  (R. at 54-55.)

### C.   Evidence in the Record

The following relevant evidence documents Plaintiff's various alleged conditions.  Though there is also evidence in the record regarding Plaintiff's psychological condition, because Plaintiff does not challenge the ALJ's determination that her depression was not severe the Court will not summarize that evidence here.

7

1.  <u>Back and Legs</u>

It is undisputed that Plaintiff suffers from degenerative joint disease of the lumbosacral spine with mild discogenic disease at the L3-4 and L4-5 levels (R. at 273), degenerative disc disease of the cervical spine at the C5-6 and C6-7 levels (R. at 270), and osteoarthritis of both knees (R. at 269, 274, 430).  The dispute turns on the impact of these conditions on Plaintiff's ability to function and the degree of pain that they cause.

On March 18, 2004, Dr. Auerbach wrote a note on a prescription pad stating "The [patient] is totally disabled/unable to work[.]" (R. at 253.)  It is unclear to whom this note is directed.

On September 21, 2004, Dr. DiMarco performed a physical examination and found that Plaintiff had "good strength and active range of motion at both hips, knees and ankles."  (R. at 276.)  Plaintiff reported pain with passive straight leg raising of each lower leg, but was able to flex forward from the waist to 80 degrees.  (<u>Id.</u>)  Dr. DiMarco detected crepitus (or crackling) in Plaintiff's left knee, suggesting arthritis.  (<u>Id.</u>)  Dr. DiMarco found that she could "ambulate independently without a hand-held assistive device," but was limited by her foot deformity.  (<u>Id.</u>) He concluded: "[Plaintiff] would have difficulty lifting and carrying heavy objects.  She may have

8

difficulty with flexion/extension movements of the lumbar spine. She would also be restricted from high level activity such as climbing or balancing." (Id.)

On November 1, 2004, a state agency medical reviewer completed a checklist, finding that Plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, stand or walk and sit about 6 hours in an 8-hour work day, and push or pull without any limitation. (R. at 305.) Moreover, the reviewer found that Plaintiff could frequently climb, stoop, kneel, and balance and occasionally crouch or crawl. (R. at 306.) The review found that Plaintiff manifested "no difficulty with ambulation, or with use of her upper extremities." (Id.)

On November 17, 2004, Dr. Kahn performed an orthopedic evaluation of Plaintiff. (R. at 373, 350.) Plaintiff reported difficulty with lifting, standing, overhead work, sleeping and getting up in the morning. (R. at 373.) She also had stiffness and difficulty bending over. (Id.) Dr. Kahn found tenderness at various points in Plaintiff's back and knees, with forward flexion of the back at 60 degrees, lateral flexion at 15 degrees, and hyperextension at 10 degrees. (Id.) Dr. Kahn was left with the impression of multilevel degenerative disk disease with lower extremity radiculopathy and internal derangement of both knees. (R. at 350.)

On December 2, 2004, an electrodiagnostic consultation "failed to demonstrate evidence of an acute radiculopathy." (R. at 354.)

After her visit with Dr. Kahn, Plaintiff spent three months in physical therapy. (R. at 358-63, 425, 427.) During her first visit to physical therapy Plaintiff showed high levels of pain and limited range of motion, and after one month her pain was reduced (her lower back when from 10 out of 10 while static to 6 out of 10 on the pain scale) and she showed a greater range of motion. (R. at 258-63.) Nevertheless, on February 23, 2005, she continued to have pain, decreased range of motion and strength, and showed "functional deficits such as unable to sit greater than 30 minutes, unable to stand greater than 15 minutes, unable to walk greater than 30 ft, unable to perform lifting or trunk bending such as making beds, carrying laundry or taking out the trash." (R. at 362.) On March 21, 2005, Dr. Kahn reported that Plaintiff was at least 80% better and was discharged to a home exercise program. (R. at 425.)

Dr. Kahn did not see Plaintiff again until January 11, 2006, when she reported "occasional low back pain and occasional [right] kn[ee] pain," and her left knee was "really bothering her." (R. at 424.) On February 28, 2006, Dr. Kahn performed arthoscopic surgery to repair a medial meniscal tear in her left knee. (R. at 403-04.) Following surgery, Dr. Kahn prescribed

10

physical therapy (R. at 401-02) and by April 5, 2006, she showed "increased strength and range of motion with decreased pain," but she continued to have difficulty standing for more than 15 minutes, walking farther than 30 feet, climbing stairs and carrying grocery bags.  (R. at 392-93.)  On May 3, 2006, Dr. Kahn reported that Plaintiff was doing "quite well," was "happy" with the knee surgery, and would be discharged to a home exercise program.  (R. at 398.)

Dr. Auerbach subsequently submitted four letters to Plaintiff's counsel regarding her claim for disability benefits. On October 30, 2006, he wrote:

> Nancy has been a patient in my office for several years with a complete diagnosis of degenerative disc disease, degenerative joint disease, gastroesophageal reflux, anxiety and depression. The patient has been unable to work for approximately a three year period as a result of her condition.  Additionally, the patient did have meniscal tear of the left knee and did have surgery on February 28, 2006 to repair the same.
> Due to this patient's condition, she is unable to work at this time and for a projected 90 day period.

(R. at 449.)  On March 28, 2007, Dr. Auerbach wrote a similar letter listing Plaintiff's conditions and stating: "The patient has been unable to work for over four years.  I see no improvement in this patient's condition and feel she is completely and totally disabled and unable to perform any gainful employment for an indefinite period."  (R. at 450.)  On June 25, 2007 and September 27, 2007, Dr. Auerbach added obesity, hallus

valgus deformity, chronic obstructive pulmonary disease, hyperthyroid disease, hearing loss and a lumbo sacral sprain to Plaintiff's lists of conditions, but no longer mentioned degenerative disc disease.  (R. at 468, 480.)  He repeated his conclusion that Plaintiff was "completely and totally disabled and unable to perform any type of gainful employment."  (R. at 468, 480.)  In his September 27, 2007, he added: "She is unable to stand or sit for any period of time."  (R. at 480.)

Of Dr. Auerbach's records from this period, only his March 27, 2007 report refers to Plaintiff's pain or physical limitations.  (R. at 461.)  His notes also show that Plaintiff fell and hit her left knee on February 14, 2007, but did not go to the hospital.  (Id.)

### 2.   Upper Extremities

During the September 21, 2004 examination, Dr. DiMarco noted that Plaintiff had signs of degenerative joint disease in the small joints of her fingers, but reported as follows regarding Plaintiff's upper extremities:

> She has good neck extension and flexion.  She has good strength and active range of motion at both shoulders, elbows and wrists.  She has good hand intrinsic strength bilaterally.  She is able to do fine and gross manipulation with both hands.  She has good grip strength bilaterally.

(R. at 275.)  The only mention of pain or limitation in her arms or hands in the medical records is found in a radiology report

from June 7, 2002, which states under history: "Right upper arm pain, radiculopathy."  (R. at 270.)

      3.   <u>Feet</u>

On September 21, 2004, Dr. DiMarco reported "toe abnormalities" in both feet, so that the "second toe of each foot crosses over the great toe."  (R. at 276.)  As a result, though Plaintiff can "ambulate independently without a hand-held assistive device," she "is unable to ambulate on her toes," "was only able to ambulate a short distance on her heels," and "has difficulty ambulating in a tandem gait."  (<u>Id.</u>)  A radiology report from March 29, 2007, showed a "marked hallux valgus deformity of [the] great toes."[1]  (R. at 460.)  Dr. Auerbach noted this condition in his June 25 and September 27, 2007 letters.  (R. at 468, 480.)

      4.   <u>Hearing</u>

Dr. DiMarco, in his September 21, 2004 report, stated that Plaintiff was able to hear all of their communication during the physical examination.  (R. at 275.)  On April 16, 2007, Dr. Cicco performed a physical exam which revealed evidence of past ear surgery but no acute infection.  (R. at 451.)  She observed that Plaintiff's records from August 2006 showed normal tympanograms,

---

[1] "Hallux valgus" is defined as "angulation of the great toe away from the midline of the body, or toward the other toes; the great toe may ride under or over the other toes."  Richard Sloan, <u>The Sloan-Dorland Annotated Medical-Legal Dictionary</u> 322 (West Publishing Co. 1987).

bilateral hearing loss of approximately 30-40dB, with "fairly good" discrimination scores at 84 percent.  (R. at 452.)  Dr. Cicco ultimately concluded that Plaintiff "should be able to function adequately in a work environment without restriction, if she is able to wear hearing aids."  (Id.)

Dr. Masud Iqbal performed the audiological analysis in August 2006 documenting Plaintiff's hearing loss, and another in May 2007.  (R. at 436-48.)  He also noted briefly on two occasions that Plaintiff's hearing loss caused difficulty with communication -- once in a note asking that Plaintiff be excused from jury duty.  (R. at 391, 438.)

    5.   Plaintiff's Testimony

At the time of Plaintiff's second hearing before the ALJ, she was fifty-five years old and married with three children.  (R. at 486-88.)  She has an eighth grade education.  (R. at 520.)  She explained that she left her most recent job, as a sandwich maker at McDonald's, in 2003 because of the pressure and the pain of the job.  (R. at 491, 523.)  She stated she was on her feet the whole day, working on the grill and the line.  (R. at 490-91.)  Prior to working at McDonald's Plainitiff was "cashiering" and "making sandwiches" at a truck stop and was employed by Pilot Corporation.  (R. at 526.)  As part of that job she had to lift "heavy boxes of frozen cookies," weighing 20 to 25 pounds.  (R. at 527.)  At both jobs she was required to sweep and mop the

14

kitchen area.  (R. at 541-42.)  In her application for benefits, Plaintiff describes her past work at the "Pit Stop" as cashier, sandwich maker, and meat slicer.[2]  (R. at 193.)  Elsewhere in her application materials she states that "All employment from 1990 through date last worked was fast food restaurants/grill work." (R. at 232.)

When explaining why she stopped working, she elaborated that she suffered from back pain and arthritis, including pain in her legs and her feet.  (R. at 492, 523.)  She explained that her feet have a deformity, where her long toes cross over her big toe.  (R. at 509.)  She has had this condition for many years. (Id.)  She added that she had pain in her hands due to arthritis that sometimes made it difficult for her to grip or hold things. (R. at 495, 528.)  She said her back hurts her constantly, but her legs and arms have good days and bad days.  (R. at 501-02, 530.)  She testified that she has had "hearing trouble" since she was little, though she had no trouble hearing the ALJ, who was sitting 15 feet from her.  (R. at 493, 523.)  She testified that she could not afford a hearing aid.  (R. at 539.)

Plaintiff testified that she could walk only half a block, stand for 30 minutes, and sit for 30 minutes, and that she had

---

[2] It is unclear whether the job at the Pit Stop is the same as the job at the truck stop.  Plaintiff's employment records indicate that she worked for the Pilot Corporation in 1996 (R. at 177), while her application says that she worked at the Pit Stop from 1981 through 1982 (R. at 199).

these same limitations three years prior.  (R. at 496-97, 529.)
In 2004 she could climb stairs, but it has become more difficult
over time.  (R. at 499-500, 530.)  She stated she has trouble
bending over and that if she drops something, she will squat down
to pick it up.  (R. at 498.)  As a result of her foot deformity,
Plaintiff testified that she is limited in what type of shoe she
can wear and sometimes her feet cramp or her ankles swell when
she walks.  (R. at 509.)  She further testified that as result of
this deformity: "I get pain, and sometimes, it's hard for me to
walk, because of the pain.  When I was working, and I'd stand up
like eight hours a day, I couldn't hardly walk to get to the
car."  (R. at 541.)  She stated that, based on Dr. Auerbach's
instructions, she could not lift more than 10 pounds.  (R. at
499, 528.)  She said she did not do chores, except that she did
"a little" cooking.  (R. at 506-07.)  She does not have any
hobbies.  (R. at 537.)  Following her arthroscopic surgery she
began to walk with a cane at the suggestion of a physical
therapist.  (R. at 527.)

## II.  DISCUSSION

### A.  Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial
review of the Commissioner's decision to deny a complainant's
application for Social Security benefits.  Ventura v. Shalala, 55
F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the

Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality. See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has

held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him. Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978). A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182. However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision. See Fargnoli, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards. Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

**B.    Disability Defined**

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB and SSI benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled,

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Substantial gainful activity is "work that - (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  This definition presupposes a regular, continuing, and sustained ability to perform such work.  Kangas v. Bowen, 823 F.2d 775, 778 (3d Cir. 1987).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis

19

codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates each case, step-by-step, until a finding of "disabled" or "not disabled" is obtained, 20 C.F.R. § 404.1520(a), summarized as follows:

> 1. If the claimant currently is engaged in substantial gainful employment, the claimant is "not disabled."
>
> 2. If the claimant does not suffer from a "severe impairment," the claimant is "not disabled."
>
> 3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant is "disabled."
>
> 4. If the claimant can still perform work the claimant has done in the past ("past relevant work"), despite the severe impairment, the claimant is "not disabled."
>
> 5.  Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If the claimant is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, the claimant will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

This analysis involves a shifting burden of proof.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on

the claimant to prove every element of her claim by a preponderance of the evidence.  In the final step, however, the Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas, 823 F.2d at 777.

   **C.   Analysis**

   Plaintiff raises three claims on appeal.  First, Plaintiff argues that the ALJ erred in concluding that she had past relevant work as a cashier.  Second, the ALJ erred in failing to include Plaintiff's arthritis of the hands, hearing loss, and hallus valgus deformity as severe impairments.  Third, the ALJ gave too little weight to Dr. Auerbach's opinion.  For the reasons expressed below, the Court rejects the first and third argument, but will remand this case to the ALJ to properly consider Plaintiff's hearing loss and hallux valgus deformity.

   1.   Whether Substantial Evidence Supports the ALJ's
        Finding that Plaintiff Has Past Relevant Work
        Experience As A Cashier?

   Plaintiff maintains that her past work experience included more than simply working as a cashier, but in truth also involved work as a sandwich maker.  Notably, Plaintiff does not deny that she has relevant work experience as a cashier, for she so testified before the ALJ and stated in her application for

benefits.  (R. at 193, 526.)  This is significant because "past relevant work" is defined as follows: "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 404.1560(b)(2); see SSR 82-62 ("The term 'work experience' means skills and abilities acquired through work previously performed by the individual which indicates the type of work the individual may be expected to perform.").  Plaintiff does not suggest that she did not learn how to be a cashier.  The fact that she might have carried two jobs does not negate the significance of her work experience in both areas (cashiering and sandwich-making).

Moreover, when considering past relevant work experience, the ALJ is permitted to consider not only the work as actually performed by the claimant, but also how that work is generally performed in the national economy, as described in the Dictionary of Occupational Title ("DOT").  SSR 82-61[3]; see 20 C.F.R. § 404.1560(b)(2); Garibay v. Comm'r of Soc. Sec., 336 F. App'x 152, 158 (3d Cir. 2009).  As the Third Circuit recently explained:

> [T]he ALJ should determine whether "the claimant retains the capacity to perform the particular

---

[3] Social Security Ruling 82-61 states that a claimant is not disabled "when it is determined that he or she retains the RFC to perform: (1) The actual functional demands and duties of a particular past relevant job; or (2) The functional demands and job duties of the occupation as generally required by employers throughout the national economy."  (emphasis in original)

> functional demands and job duties peculiar to an
> individual job as he or she actually performed it"
> or whether "the claimant retains the capacity to
> perform the functional demands and job duties of
> the job as ordinarily required by employers
> throughout the national economy." S.S.R. 82-61,
> 1982 SSR LEXIS 31. In the latter inquiry, the ALJ
> may rely on job descriptions found in the
> Dictionary of Occupational Titles ("DOT"). <u>Id.</u>
> "[I]f the claimant cannot perform the excessive
> functional demands and/or job duties actually
> required in the former job but can perform the
> functional demands and job duties as generally
> required by employers throughout the economy, the
> claimant should be found to be 'not disabled.'"
> <u>Id.</u>

<u>Garibay</u>, 336 F. App'x at 158.  Consequently, because there is

substantial evidence to support the ALJ's finding that Plaintiff

has relevant work experience as a cashier, the ALJ did not err in

relying on the DOT to determine how that job is performed in the

national economy.

To support her contrary argument regarding error, Plaintiff

relies on <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112 (3d

Cir. 2000) for the principle that Plaintiff's testimony is the

primary source of information regarding her past relevant work

and should be accepted unless contradicted by substantial

evidence.  In <u>Burnett</u>, however, the ALJ did not look to the DOT

to determine how the claimant's past work was performed in the

national economy, but instead simply rejected the claimant's

uncontroverted testimony regarding her actual job

responsibilities.  <u>Id.</u> at 123-24.  In the present case, the ALJ

did not reject Plaintiff's testimony regarding the nature of her

23

work as a cashier, but instead turned to the DOT to determine how that job would be performed in the national economy, as he was so entitled.  See Garibay, 336 F. App'x at 158.  The Court finds that the ALJ did not err when he found that Plaintiff had past work experience as a cashier and looked to the DOT to determine how that job is performed in the national economy.

      2.   <u>Whether the ALJ Properly Evaluated Plaintiff's Alleged Arthritis of the Hands, Hearing Loss, and Hallus Valgus Deformity of the Feet?</u>

Plaintiff argues that the ALJ failed to consider the arthritis in Plaintiff's hands and her feet deformity, and that he erred in concluding that her hearing loss was not severe.  The Commissioner responds that the ALJ sufficiently considered the evidence in the record and that substantial evidence supports his determination that none of these three alleged ailments amount to severe impairments.  For the reasons discussed below, the Court concludes that the ALJ sufficiently considered any impairments to Plaintiff's upper extremities and that substantial evidence supports the ALJ's determination that her hands were not severely impaired.  The Court does find, however, that the ALJ erred in failing to consider evidence of deformity in Plaintiff's feet and the degree to which that deformity might interfere with her ability to work.  The ALJ also erred by giving great weight to Dr. DiMarco's opinion that Plaintiff could work without

24

limitation if using a hearing aid, and then failing to address Plaintiff's testimony that she cannot afford a hearing aid.

"An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a). This is generally a low bar, such that "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'"  Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (quoting SSR 85-28).

On the issue of Plaintiff's hand arthritis, it is true that the ALJ did not expressly mention this condition under in section addressing Step Two of his analysis.  Nevertheless, the ALJ did consider Plaintiff's complaints regarding her upper extremities and explained his reason for rejecting them, stating: "The undersigned also notes that the record is absent of any evidence that the claimant ever reported upper extremity pain to her doctors and there is no indication that she was ever treated for such pain."  (R. at 53.)  Claimant does not challenge the ALJ's negative credibility finding, as a whole, and the Court finds that the record is almost entirely bereft of any evidence (beyond Plaintiff's discredited testimony at her ALJ hearings) to show limitations to her upper extremities.

25

The only evidence suggesting that Plaintiff might have complained of pain in her extremities is in a brief note on a radiology report from June 2002 (before Plaintiff stopped working) that states in full, "History: Right upper arm pain, radiculopathy."  (R. at 270.)  None of Plaintiff's treating or consulative doctors, nor her physical therapists, report complaints of pain to her upper extremities, nor did Plaintiff receive any treatment for such a condition.  In fact, though Dr. DiMarco noted "signs of DJD," she found that Plaintiff had no physical limitations in her arms or hands.  (R. at 275.)  In the absence of any evidence showing that Plaintiff was impaired as a result of arthritis in her hands, the ALJ did not err in finding that such a condition was not severe.

On the issue of Plaintiff's foot deformity, however, the ALJ appears to have ignored this condition entirely.  Yet this issue was certainly presented to the ALJ.  In addition to Plaintiff's testimony at both evidentiary hearings regarding the pain caused by her foot deformity and the degree to which it limits her ability to walk, (R. at 509, 541), Plaintiff offered medical evidence of the deformity in the form of a radiology report, (R. at 460).  Significantly, Dr. DiMarco, whose opinion the ALJ gave significant weight (R. at 54), found that Plaintiff "is unable to ambulate on her toes," "was only able to ambulate a short distance on her heels," and "has difficulty ambulating in a

tandem gait" as a result of this deformity.  (R. at 276.)  The ALJ makes no mention of this medical evidence, or how Plaintiff's difficulty ambulating,[4] when considered in combination with her other recognized ailments, might affect her RFC.[5]  The Court recognizes the Commissioner's argument that Plaintiff was able to work with this deformity for years, but an impairment that is not severe alone might become severe in combination with Plaintiff's recognized degenerative conditions.  See Newell, 347 F.3d at 546.

In this case, the ALJ makes no reference to Plaintiff's feet deformity, so the Court is unable to determine if the ALJ considered the condition and determined that it was not severe, or simply ignored the condition.  The ALJ's failure to mention and explain the significance (or insignificance) of Plaintiff's foot deformity, where it is documented by medical evidence, was error and requires remand.  See Burnett, 220 F.3d at 121-22.

---

[4] That Dr. DiMarco found that Plaintiff can ambulate without an assistive device and at a reasonable pace does not address how long she can walk or with what degree of pain or difficulty.

[5] The Court also notes that the ALJ misread Dr. DiMarco's opinion regarding Plaintiff's ability to climb or balance.  Dr. DiMarco stated that Plaintiff "would also be restricted from high level activity such as climbing or balancing," suggesting that Plaintiff cannot climb or balance or perform other "high level" or vigorous activity.  (R. at 276.)  The ALJ read Dr. DiMarco's opinion to limit Plaintiff only "from climbing at high altitudes."  (R. at 54.)  On remand, the ALJ will have the opportunity to correct this misreading and to determine what impact this correction might have on the ALJ's determination that Plaintiff "can frequently climb ramps and stairs, balance, stoop and kneel."  (R. at 54.)

The ALJ similarly erred when he found that Plaintiff's hearing loss did not impair her ability to work, based on Dr. Cicco's opinion that she could work without impairment so long as she used hearing aids, without considering Plaintiff's testimony that she cannot afford hearing aids.  While a claimant must generally follow a prescribed treatment plan if the treatment can restore her ability to work, the claimant may still be entitled to benefits if she provides a "good reason" why she cannot follow the prescribed plan.  20 C.F.R. § 404.1530.  Courts have recognized that inability to pay for medical treatment may be a sufficiently good reason for refusing to follow a treatment plan. Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984) (refusal to follow prescribed treatment did not preclude finding of disability  where claimant could not afford treatment); see Newell, 347 F.3d at 547 (plaintiff's inability to afford medical treatment may not be used against plaintiff).  The ALJ was therefore required to address Plaintiff's testimony that she cannot afford a hearing aid.

Contrary to the Commissioner's suggestion, the ALJ's credibility determination is not sufficient to render Plaintiff's testimony on this subject irrelevant.  The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. at 54.)  The ALJ does not consider Plaintiff's testimony regarding

28

her income and offers no reasons to doubt her testimony regarding
her ability to pay for hearing aids.  Given that the ALJ found
that Plaintiff's hearing would not impair her ability to work
based entirely on Dr. Cicco's medical opinion that she required
hearing aids, it was error for the ALJ to ignore Plaintiff's
testimony that she could not afford hearing aids.

> 3.   <u>Whether the ALJ Gave Insufficient Weight to Dr.
>      Auerbach's Opinion?</u>

Plaintiff argues the ALJ improperly discounted Dr.
Auerbach's opinion that Plaintiff has been unable to work for at
least three years and is currently unable to work and is
disabled.  For the reasons next discussed, the Court rejects this
argument, because Dr. Auerbach's conclusion that Plaintiff is
disabled is entitled to no weight.

Although the ALJ must examine all evidence of record,
treating physicians have important perspectives on claimants'
impairments, as the Commissioner recognizes:

> Generally,   [the   Social   Security
> Administration]   give[s]   more   weight   to
> opinions  from  your  treating  sources,  since
> these  sources  are  likely  to  be  the  medical
> professionals most able to provide a detailed,
> longitudinal   picture   of   your   medical
> impairment(s)   and   may   bring   a   unique
> perspective  to  the  medical  evidence  that
> cannot be obtained from the objective medical
> findings  alone  or  from  reports  of  individual
> examinations,   such   as   consultative
> examinations or brief hospitalizations. If we
> find  that  a  treating  source's  opinion  on  the
> issue(s)  of  the  nature  and  severity  of  your
> impairment(s)  is  well-supported  by  medically

29

> acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the
> other substantial evidence in your case
> record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2). "[T]he ALJ must . . . pay close attention to the medical findings of a treating physician." Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986). Statements by a physician that a claimant is or was "unable to work," however, are not "medical opinions" but instead are "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(e)(1). For this reason, the Third Circuit has found that the opinion of a treating physician that a claimant is unable to work[6] "is not the sort of treating source medical opinion entitled to any kind of weight." Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 n.2 (3d Cir. 2008) (citing 20 C.F.R. § 404.1527(e)(1)); Taylor v. Barnhart, 474 F. Supp. 2d 650, 662 (D. Del. 2007) ("It is within the ALJ's lone discretion to determine whether an individual is disabled or 'unable to work' under the statutory definition.")

The ALJ accepted Dr. Auerbach's listed diagnoses, but instead rejected Dr. Auerbach's ultimate conclusion that

---

[6] In Johnson, the treating physician opined that claimant's impairments made her "unable to perform not only her past relevant work, but several other jobs which were offered during the course of her Workers' Compensation claim." 529 F.3d at 203 n.2.

Plaintiff is unable to work.  The ALJ was required to make this
ultimate determination, guided by the extensive statutory and
regulatory framework governing benefits under Title II, and was
entitled to make this decision without deference to Dr.
Auerbach's suggestion to the contrary.[7]  See  20 C.F.R. §
404.1527(e)(1); Johnson, 529 F.3d at 203 n.2.[8]

_____

[7] The importance of reserving such a decision to the ALJ is
emphasized in the case at bar.  Though Dr. Auerbach concluded
that Plaintiff has been unable to work for several years and
remains unable to work, he did not did not determine Plaintiff's
residual functional capacity, as required by the regulations,
beyond stating broadly that "She is unable to stand or sit for
any period of time" -- a statement directly contradicted by
Plaintiff herself (who testified that she could both sit and
stand for 30 minutes).  (R. at 480.)  There is no further
discussion regarding how her medical condition impaired her
functioning, nor how the listed conditions prevented her from
performing "any type of gainful employment."  If, as Plaintiff
urges, the ALJ had given controlling weight to Dr. Auerbach's
conclusion that Plaintiff was unable to work, such a finding
would be dispositive of the case, and yet would fail to meet the
statutory and regulatory requirements to establish a disability
as defined by the Social Security Act.

[8] Though in Johnson the Third Circuit was clear that
opinions from treating physicians on issues reserved for the ALJ,
and in particular opinions regarding the claimant's ability to
work, deserve no weight, the Court recognizes that a Third
Circuit decision issued some months after Johnson could be read
to call that holding into doubt.  In Brownawell v. Comm'r Of Soc.
Sec., 554 F.3d 352 (3d Cir. 2008), the Third Circuit reversed the
decision of the ALJ, in part for rejecting the opinion of a
treating physician in its entirety.  Part of that physician's
opinion included a conclusion that Plaintiff could not work and
was disabled.  Id. at 355 ("In an October 26, 2001 letter,
[treating physician] Dr. Grem states that 'the frequency and
severity of [Brownawell's] migraines ... prevent her from working
in any type of fixed schedule.... [T]his illness dominates her
life to the extent that I consider her to be disabled.'").  The
Brownawell court makes no mention of Johnson or 20 C.F.R. §
404.1527(e).

31

## III.  CONCLUSION

For the reasons stated above, this Court will vacate the Commissioner's decision and finds that remand to the Administrative Law Judge is warranted for consideration of the impact of the deformity of Plaintiff's feet and of her inability to afford a corrective hearing aid.  The accompanying Order is entered.


**May 12, 2010**                    **s/ Jerome B. Simandle**
DATE                                JEROME B. SIMANDLE
                                    United States District Judge

---

The Court finds <u>Brownawell</u> to be distinguishable from <u>Johnson</u> and the case at bar, for in <u>Brownawell</u> the opinion of the treating physician included true "medical opinion" consistent with 20 C.F.R. § 404.1526(e) regarding the frequency and severity of the claimant's impairment, yet the ALJ rejected the entire opinion without sufficient justification.  In contrast, the specific opinions at issue in <u>Johnson</u> and here (and the only opinions the ALJ rejected) were solely the ultimate conclusion regarding ability to work.  <u>See Johnson</u>, 529 F.3d at 203 n.2. The <u>Johnson</u> court specifically distinguished between the medical findings of the treating physician, which generally must be given great weight, and the ultimate conclusion regarding the ability to work, which is given no weight.  <u>Id.</u> at 202-203, 203 n.2. Taken together <u>Brownaville</u> and <u>Johnson</u> reaffirm the requirement that the ALJ properly weigh well-supported medical opinions, but should not abdicate his or her role on the dispositive question. Certainly, nothing in <u>Brownaville</u> can be read to reject or minimize 20 C.F.R. § 404.1526(e).